### Avis M. PETTAWAY et al.

### v.

### COUNTY SCHOOL BOARD OF SURRY COUNTY, VIRGINIA, et al.

### Civ. A. No. 3766.

United States District Court
E. D. Virginia,
Richmond Division.

June 18, 1964.

S. W. Tucker, Henry L. Marsh, III, Richmond, Va. for plaintiffs.

Willis W. Bohannan, Bohannan & Marable, Petersburg, Va., John F. Kay, Jr., Denny Valentine & Davenport, Richmond, Va., for County School Bd. of Surry County, and M. B. Joyner, Division Superintendent of Schools.

Robert Y. Button, Atty. Gen. of Virginia, R. D. McIlwaine, III, Asst. Atty. Gen., of Virginia for W. W. Wilkerson, Superintendent of Public Instruction and State Bd. of Ed.

Ernest W. Goodrich, Commonwealth's Atty., and J. Segar Gravatt, Blackstone, Va., for Bd. of Supervisors and A. T. Sowder, Treasurer.

BUTZNER, District Judge.

This Court previously denied an interlocutory injunction. Upon appeal the denial of the interlocutory injunction was affirmed and the case remanded for prompt determination on the merits. Pettaway v. County School Board of Surry County, No. 9286, 332 F.2d 457 (4th Cir. 1964). The parties stipulated that the evidence heard on the motion for the interlocutory injunction should be considered a part of this record. They also introduced additional evidence.

The plaintiffs seek an injunction prohibiting the payment of tuition grants to persons residing in Surry County, requiring the School Board to operate all schools under its jurisdiction, requiring the Board of Supervisors to appropriate for the operation of public schools funds at least equal to those appropriated for the 1962–63 session, prohibiting assignment and admission of children or employment of teachers and administrative personnel in any school on the basis of race, and requiring the Board of Supervisors to appropriate funds for the continued operation of public schools in the County.

The defendants answered, denying that the plaintiffs are entitled to the relief they seek. They moved to dismiss for lack of jurisdiction, failure of the complaint to state a cause of action, and misjoinder of defendants who are sued as individuals and in their corporate capa-

city. The defendants also moved the Court to abstain until the Supreme Court of Appeals of Virginia construes the provisions of the Virginia Constitution and statutes in controversy.

The facts are not in material conflict. They may be briefly stated.

The Board of Supervisors and the School Board jointly passed the following resolution:

"Be it RESOLVED, by the Board of Supervisors of Surry County and the County School Board of Surry County, in meeting assembled this thirtieth day of June, 1954, as follows:

"FIRST: That it is our considered judgment that the best interest of public education for both the White and Negro children in Surry County, and the only way to maintain an efficient system of public education as required by the Constitution of Virginia, is through the continuation of a segregated school system and to that end we express our unalterable opposition to integration of the races in the public schools to any degree, now or at any time in the future, and pledge to the people of this County our best efforts to continue our present educational system.

"SECOND: Recognizing the right of all children, regardless of race, to enjoy equal school facilities, we are prepared to equalize school facilities for the colored race of this county where it does not now exist; to bring about complete equalization as quickly as humanly possible, and to that end are prepared to go forward with a building program which has been started several years ago to reach the desired conditions."

This resolution has not been rescinded. The meeting which passed it was attended by E. F. Huber and J. L. White, who were then members of the School Board and are presently two of the three members of the Board. It was also attended by M. B. Joyner, who was then and is now the Division Superintendent of Schools, and Ernest E. Goodrich, who was then and is now attorney for the Commonwealth.

The School Board has not made any plans for the desegregation of the public schools in the County.

Prior to the 1963–64 school session the School Board operated one school attended only by white students known as Surry School, at which both elementary and high school grades were taught. All of the teachers and the principal of this school were white.

The School Board also operated New Lebanon School, an elementary school for Negro students, and L. P. Jackson School, an elementary and high school for Negro students. All of the teachers and both principals of these schools are Negroes.

On June 24, 1963 the State Pupil Placement Board assigned the seven infant plaintiffs, who are Negroes, to the Surry School.

Shortly thereafter a mass meeting of the white citizens of Surry County convened at the Community Center. Mr. Ernest W. Goodrich, Commonwealth Attorney, presided at this meeting. All three members of the Board of Supervisors attended. The situation concerning the assignment of the Negro students at Surry School was discussed and the possibility of a private school was mentioned. Those present at the meeting decided to call another mass meeting.

A second mass meeting of the white citizens of the County was soon called. The attendance was large. Two members of the Board of Supervisors and one member of the School Board attended this meeting. The persons in attendance decided to organize a private school and made preliminary arrangements to accomplish this. They also recommended to the School Board that public schools be continued. In response to a question, a member of the School Board stated that all teachers were under contract which contained a cancellation clause of thirty days.

Mr. Goodrich, who was the Commonwealth Attorney, was authorized to prepare articles of incorporation of the Surry County Educational Foundation. He was named registered agent of the corporation. In Virginia a commonwealth attorney may engage in the general practice of law. He ordinarily does not devote all of his time to the affairs of his office.

On July 15, 1963 the State Corporation Commission of the Commonwealth of Virginia issued a certificate of incorporation. The Board of Directors of the corporation was organized in such a manner that five persons were selected from each magisterial district in the County.

Mr. Goodrich, the Commonwealth Attorney, served on the Board for four or five weeks. He then resigned.

The Treasurer of the County served a short time as Treasurer of the Foundation. He then resigned.

The officers and directors of Surry County Educational Foundation organized and established a school. The president of the Foundation in July asked the Superintendent of Schools to release the teachers under contract to the School Board. The Superintendent declined to do so at that time.

The officers of the Foundation prepared forms by which the students or their parents could notify the School Board that the children were withdrawing from the public school and enrolling in the Foundation's school. The forms were transmitted to the Board by the parents or by the officers of the Foundation.

Substantially all of the pupils who formerly attended Surry School enrolled in the Foundation's school. Enrollment in the Foundation's school is by invitation of the officers of the Foundation. No white student who has applied for admission has been denied.

Negro pupils who had been assigned to the Surry County School sought admission to the Foundation's school and were denied. No Negro child who has applied for admission to the Foundation's school has been enrolled.

On August 15, 1963 the School Board submitted to the Board of Supervisors its estimate of funds necessary for the operation of public schools in the amount of $37,000. The Board of Supervisors, after being advised that the Superintendent of Schools could not estimate how many pupils would be attending the public school for white pupils, deferred acting upon the estimate. On August 29, 1963 the Superintendent of Schools submitted an adjusted estimate of funds necessary for the operation of public schools in the amount of $26,000, for which an appropriation was approved.

On August 23, 1963 the School Board received a report from the School Superintendent that the Surry County Educational Foundation had informed him that it had enrolled 431 pupils, all of whom except first-grade pupils were previously enrolled in the Surry School. He also pointed out to the Board that the number of pupils previously enrolled in the Surry School totaled 431 and that there would be few if any pupils in attendance other than the seven Negro students who were assigned to the Surry School. The Superintendent presented to the Board the resignations of fourteen of the twenty teachers, who were under contract for the Surry School. No action was taken by the Board on the resignations.

The next day, August 24, 1963 the School Board met. The resignations of three more teachers were presented and the Superintendent advised the Board that he expected the resignations of three additional teachers. The School Board decided that the Surry School would not be operated for the session 1963–64 due to lack of sufficient pupils to justify its operation. The teachers' resignations already presented to the Board were accepted and the Superintendent was instructed to accept resignations of additional teachers.

By September 3, 1963 all resignations of teachers who were under contract for Surry School had been received and accepted.

Teachers formerly employed by the School Board at Surry School taught at

the Foundation's school. Under the provisions of § 51–111.38:1, Code of Virginia, 1950, as amended in 1956, these teachers could become eligible for membership in the Virginia Supplemental Retirement System. Teachers who have received Board of Education scholarships may satisfy their obligations to repay the grant by teaching at either a public school or the Foundation's school, § 23–38.1, Code of Virginia, 1950, as amended in 1959.

The seven Negro pupils who had been assigned by the Pupil Placement Board to the Surry School were permitted to attend the L. P. Jackson School without any further applications.

The School Board sold three buses to a motor vehicle dealer and purchased three new school buses. The Foundation purchased from a motor vehicle dealer surplus school buses to provide transportation for its school. Ten school buses formerly used by Surry School are still owned by the School Board. On December 3, 1963 the School Board sold two new buses to the Hampton School Board.

Lebanon and Jackson Schools were opened on September 5. Initially classes were crowded and the pupil-teacher ratio was high. School buses were also crowded. Shortly after the school started, additional teachers were employed and the pupil-teacher ratio was reduced. The school buses were rerouted, which eliminated their crowded condition. The schools are crowded and plans have been made for additions.

The Surry School is not in use. During the 1963–64 school term, children attending school in the County were segregated by race.

The tuition at the Foundation's elementary school is $375 and at its high school $380. State and County tuition grants made available by § 22–115.29, et seq. of the Code of Virginia, 1950, as amended, provide $250 for elementary school children and $275 for high school children. The balance of the cost is being paid by parents of the individual students upon various terms.

During the 1963–64 school term 436 pupil scholarships for pupils in Surry County were approved and paid. Three or four of these pupils are Negroes. The total cost of the approved applications was $108,137.53, of which $57,566.66 was paid by the State and $50,570.87 was paid by the County. The County paid the individual pupils or their parents and the State reimbursed the County.

Acting under the provisions of § 22–294.2 of the Code of Virginia, 1950, as amended, the County set up a special transportation fund for students who were not attending the public school. The County paid the individual students or their parents and the State reimbursed the County for one-half of the total expenditure. Three hundred eighty-three pupils received grants aggregating $8,182.80.

The School Board prepared for consideration of the Board of Supervisors proposed expenditures for the school session 1964–65 based on pupil scholarships and transportation grants. The County's share of costs under the proposed estimate is $203,034. An alternative expenditure estimate made without reference to pupil scholarships and transportation grants totals $203,037.88 for the County's share.

During the 1962–63 school year, 9,489 students in the State of Virginia received tuition grants, which aggregated $2,252,995. This was less than 1% of the total amount spent on schools in the State. During the year 1963–64, 11,586 Virginia pupils receiving scholarships attended approximately 435 different schools, which were located in Virginia and many other states.

The present laws authorizing state and local scholarships for education of children were enacted by the General Assembly in 1960. Sections 22–115.29 through 22–115.37, Code of Virginia, 1950, as amended. State tuition grants, however, had their inception some thirty-four years ago for children whose fathers were lost in World War I.

In 1955 the Supreme Court of Appeals of Virginia held that the appropriation of State funds to pay fees of children attending private schools violated the Virginia Constitution. Almond v. Day, 197 Va. 419, 89 S.E.2d 851 (1955). Section 141 of the Virginia Constitution was then amended to authorize the appropriation of funds for educational purposes of Virginia students in non-sectarian private schools.

Legislation enacted in 1956 incorporating the statutes authorizing tuition grants into Virginia's "massive resistence" to desegregation program was declared unconstitutional. Harrison v. Day, 200 Va. 439, 106 S.E.2d 636 (1959).

In 1959 the General Assembly of Virginia abandoned "massive resistence" and turned to a "freedom of choice" program. The old tuition grant laws were repealed and new ones were enacted.

Scholarships are now available to every pupil in Virginia from state funds in the sum of $125 for elementary school and $150 for high school. This amount is supplemented by an additional sum from local sources, making a total of $250 for elementary school and $270 for high school, or an amount equal to the actual cost of tuition at the school attended or the total per pupil cost in the public schools in the county providing the scholarships, whichever is less. The scholarships are available to white and Negro pupils. Their use is not limited to schools in Virginia. The State Board of Education may prescribe the minimum academic standards that must be met by any private school, but may not deal in any way with the requirements of a school concerning the eligibility of pupils who may be admitted. Grants are not available for use at sectarian schools.

Scholarships are paid to individual pupils or their parents by counties or cities, which are reimbursed by the state for its share. The applicant for a scholarship must set forth the name of the school in which he has been accepted. The person responsible for the pupil must refund the scholarship if the pupil fails to attend regularly.

As a preface to the Court's conclusions of law, it should be stated that the plaintiffs do not contend that the Virginia laws authorizing tuition grants are unconstitutional on their face.

It should also be noted that the plaintiffs do not seek relief against the Surry County Educational Foundation or an injunction requiring their admission to the Foundation's school. Nor do the plaintiffs insist that they have a constitutional right to require that white children attend schools with Negro children.

The principles expressed in Pierce v. Society of Sisters, etc. 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925), and Farrington v. T. Tokushige, 273 U.S. 284, 47 S.Ct. 406, 71 L.Ed. 646 (1927), which afford children the right under the Fourteenth and Fifth Amendments to attend private schools, are beyond question. The right of children, white or Negro, to attend a private school is not an issue in this case.

Judge Haynsworth in Pettaway v. County School Board of Surry County, No. 9286, 332 F.2d 457 (4th Cir. 1964) clearly stated the issue presented by this case:

"The plaintiffs' right to relief is dependent upon their establishing as a fact that the operation of the Foundation school is state action in the constitutional sense, or that they were otherwise denied the equal protection of the laws when the withdrawal of all the white pupils from Surry School was facilitated by the availability of tuition grants."

The Supreme Court when considering the effect of private segregated white schools in Prince Edward County, Virginia, which were supported directly or indirectly by state or county funds, answered the constitutional question raised by this case. In Griffin v. County School Board of Prince Edward County, 84 S.Ct. 1226 (1964) the Court said, after describing a plan by which Louisiana

public schools could be changed to private schools:

"* * *. While the Louisiana plan and the Virginia plan worked in different ways, it is plain that both were created to accomplish the same thing: the perpetuation of racial segregation by closing public schools and operating only segregated schools supported directly or indirectly by state or county funds. See Cooper v. Aaron, 358 U.S. 1, 17, 78 S.Ct. 1401, 1409, 3 L.Ed.2d 5 (1958). Either plan works to deny colored students equal protection of the laws. Accordingly, we agree with the District Court that closing the Prince Edward schools and meanwhile contributing to the support of the private segregated white schools that took their place denied petitioners the equal protection of the laws.

"* * *. The injunction against paying tuition grants and giving tax credits while public schools remain closed is appropriate and necessary since those grants and tax credits have been essential parts of the county's program, successful thus far, to deprive petitioners of the same advantages of a public school education enjoyed by children in every other part of Virginia."

In Prince Edward County all public schools were closed. In Surry County only the white public school was closed. Negro public schools remained open. The distinction is not of controlling significance in determining the constitutional question. Both situations are variations upon the same theme. State and County funds are used to perpetuate racial segregation in the schools located in Surry County. These funds subsidize the Foundation's segregated school as a substitute for the County's public school to which the Pupil Placement Board assigned the seven Negro children. State action in Surry County, no less than in Prince Edward, is encompassed by Cooper v. Aaron, 358 U.S. 1, 17, 19, 78 S.Ct.

1401, 1409–1410 (1958), where the Court said:

"Thus the prohibitions of the Fourteenth Amendment extend to all action of the State denying equal protection of the laws; whatever the agency of the State taking the action, * * *. In short, the constitutional rights of children not to be discriminated against in school admission on grounds of race or color declared by this Court in the Brown case can neither be nullified openly and directly by state legislators or state executive or judicial officers, nor nullified indirectly by them through evasive schemes for segregation whether attempted 'ingeniously or ingenuously.'

"* * *.

"State support of segregated schools through any arrangement, management, funds, or property cannot be squared with the Amendment's command that no State shall deny to any person within its jurisdiction the equal protection of the laws."

The Court concludes that the laws providing scholarships and transportation grants are being administered unconstitutionally by state and local officials in Surry County.

The plaintiffs are entitled to the relief which they seek, with three exceptions:

First: The facts do not establish that the School Board closed Surry School because the Board of Supervisors withheld funds for its operation or that sufficient funds are not now available. The Court will not assume, in the absence of evidence, that the Board of Supervisors will frustrate the duty of the School Board to operate all schools within its jurisdiction. Nevertheless, Surry School has not yet been opened or funds appropriated, and the Board of Supervisors and its members will be retained as parties defendant. Adequate precedent exists for requiring the appropriation of funds for the County's schools while

other public schools in the State are open. Griffin v. County School Board of Prince Edward County, 84 S.Ct. 1226 (1964).

Second: The evidence is insufficient for this Court to grant an injunction prohibiting discrimination in the employment of faculty and administrative personnel. The obligation of the School Board to plan for removal of discriminatory practices in this respect has been mentioned in Jackson v. School Board of the City of Lynchburg, Virginia, 321 F. 2d 230, 233 (4th Cir. 1963).

 Third: The plaintiffs seek an injunction restraining those defendants who are responsible for the disbursement of tuition funds from " * * * processing or approving any applications for state or county scholarships from persons residing in Surry County or from paying or causing the payment of such scholarships to any persons residing in Surry County until the further order of this Court." The relief sought is unnecessarily broad. These defendants will be restrained from authorizing or paying scholarships which are intended for use at schools which racially discriminate. No sound reason has been advanced for prohibiting scholarships for use at other schools.

It should be emphasized that the relief which has been fashioned is responsive only to the issue in this case. The Court does not decide whether similar relief would be appropriate with respect to a county or city where no racial discrimination was found in the operation of the public school system. This broader aspect of the scholarship and transportation program involves analogies with the situations mentioned in Cochran v. Louisiana State Board of Education, 281 U.S. 370, 50 S.Ct. 335, 74 L.Ed. 913 (1930) (supplying school books for children in private schools), Everson v. Board of Education, 330 U.S. 1, 67 S.Ct. 504, 91 L.Ed. 711 (1947) (transporting children attending parochial schools), scholarships under the G. I. bill of rights and other state and federal programs. Upon these issues the Court intimates no opinion.

It should also be noted that the plaintiffs do not seek restraint of state scholarships throughout Virginia. Whether the entire state program is invalidated by unconstitutional administration in a single locality is not a question before the Court.

The plaintiffs are entitled to reasonable attorneys' fees. Bell v. School Board of Powhatan County, Virginia, 321 F.2d 494, 500 (4th Cir. 1963). Upon notice of motion and consideration of pertinent evidence the Court will determine the amount to be allowed.

Without reiteration, it is apparent that the Court has jurisdiction, the complaint states a cause of action, effective relief requires retention of all defendants, and abstention is inappropriate. The defendants' respective motions will be overruled. Costs will be allowed the plaintiffs. This cause will be retained on the docket with leave of any party to petition for further relief.